UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CV-25025-GAYLES/STRAUSS

**ACHERON PORTFOLIO TRUST**, *et al.*,

      Plaintiffs,

v.

**BARRY MUKAMAL,** as Trustee of the
MUTUAL BENEFITS KEEP POLICY
TRUST,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

    **THIS CAUSE** comes before me upon Defendant's Motion to Dismiss Petition to Compel

Arbitration and Request for Hearing ("Motion to Dismiss").  (DE 13).  The Motion to Dismiss

seeks dismissal of Plaintiffs' Petition to Compel Arbitration and Request for Hearing ("Petition to

Compel Arbitration")[1] (DE 1).  The District Court has referred the Motion to Dismiss to me for

appropriate disposition.  (DE 17).  I have reviewed the Motion to Dismiss, the Response (DE 18)

and Reply (DE 26) thereto, all exhibits to the Motion to Dismiss and Response, and the record in

this case.  In addition, I held a status conference ("Status Conference") on February 10, 2021 and

heard oral argument pertaining to the Motion to Dismiss.[2] (DE 31).  Being otherwise duly advised,

I respectfully **RECOMMEND** that the Motion to Dismiss (DE 13) be **GRANTED** and the Petition

to Compel Arbitration be **DISMISSED** for the reasons stated herein.

---

[1] Plaintiffs are Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust, STYX
Portfolio Trust ("Trust Plaintiffs"), and Acheron Capital, Ltd. ("Acheron Capital"), collectively
the Acheron entities (the "Acheron Entities").

[2] The Status Conference addressed both this case and a related case, *SEC v Mut. Benefits Corp.*,
No. 04-cv-60573 (S.D. Fla.) [hereinafter, *Enforcement Action*].  The *Enforcement Action* has been
referred to me for disposition of all post-judgment matters.

## BACKGROUND

The parties' dispute arises from the *Enforcement Action* that was initiated by the Securities and Exchange Commission ("SEC") in 2004 against the defendants in that case for fraudulently selling fractional viaticated investment interests in life insurance policies.  *See Enforcement Action*; *see also SEC v. Mut. Benefits Corp.*, No. 04-60573-CIV-MORENO/STRAUSS, 2020 WL 5259162, at *1-*3 (S.D. Fla. Sept. 3, 2020).[3]  In June 2009, the Receiver in the *Enforcement Action* reported that, pursuant to Court approval, investors in the life insurance policies had voted to either: a) sell the policy; or b) retain the policy ("Keep Policies").  *See Enforcement Action* at DE 2291 at 3.  On September 25, 2009, the Receiver executed with Barry Mukamal, as Trustee (the "Mutual Benefits Trustee" or the "Trustee") the Mutual Benefits "Keep Policy" Trust Agreement creating the Mutual Benefits Keep Policy Trust (the "Mutual Benefits Trust" or the "Trust").  *See Enforcement Action* at DE 2540 at 2; DE 2540-1.  The purpose of the Mutual Benefits Trust is to hold, maintain, and administer the Trust Assets, including the Keep Policies, for the benefit of the Keep Policy investors.  *See Enforcement Action* at DE 2540-1 at § 2.2.

As noted in the *Enforcement Action*, "when investors in [the life insurance policies held by the Trust] do not pay their pro rata share of the premium obligations associated with their interest, the policy is at risk of lapse." *Enforcement Action* at DE 2500 at 4.   The Acheron Entities have purchased such defaulting interests from both the Receiver, and, since the end of the Receivership, from the Trustee.  The Acheron Entities' purchase of such interests and payment of the premium obligations avoids the lapse of the policy and keeps the non-defaulting investors from losing their

---

[3] Plaintiffs request that the Court take judicial notice of the docket and the court files in the related *Enforcement Action*, which is proper in this case.  *See* DE 18 at n.1; Fed. R. Evid. 201(b), (c)(1)(2), (d).

interests in the policy.  *Id.*  Plaintiffs allege to have paid the Receiver in the *Enforcement Action* more than $9 million to purchase fractional interests in the subject life insurance policies during late 2008 and early 2009.  (DE 1 at ¶¶17-18).  Acheron Capital states that the Trust Plaintiffs additionally paid the Trustee more than $35 million to acquire fractional interests in Keep Policies. (DE 18 at 7).  According to the Mutual Benefits Trustee, the Trust Plaintiffs have received more than $245 million in death benefits as a result of their purchases from both the Receiver and the Trustee.  (DE 13 at 6).

At the same time as the formation of the Mutual Benefits Trust, the Trustee entered into a Servicing Agreement effective September 25, 2009 with Litai Assets, LLC ("Litai").[4]  *See Enforcement Action* at DE 2266-3; DE 2809-14.  The Servicing Agreement has been renewed to extend servicing through the later of (a) March 31, 2021 or (b) ten (10) days after the date that the Court enters an Order approving a new servicing agreement (collectively, the "Servicing Agreement").  *See Enforcement Action* at DE 2500-1; DE 2626-1; DE 2794; DE 2798.

On March 19, 2015, the Mutual Benefits Trustee made an agreement (the "March 2015 Agreement") with Acheron Capital.  *See Enforcement Action* at DE 2500-2.  The March 2015 Agreement resulted from extensive negotiations between Acheron Capital and the Trustee and was intended to resolve the Acheron Entities' concerns pertaining to the purchase of defaulting policy interests held by the Trust.[5]  *See Enforcement Action* at DE 2500 at 4, 9.  Among other provisions,

---

[4] In April 2009, the Court approved the sale of the receivership's servicing business to the predecessor of Litai to provide for the continued servicing of the receivership assets that were transferred to the Trust.  *See Enforcement Action* at DE 2267.

[5] The March 2015 Agreement sought, *inter alia*, to resolve the dispute between Acheron Capital and the Trustee as to whether the interests in the Trust that are purchased by Acheron Capital's clients (and owned by the Trust Plaintiffs) are entitled to receive the same rights and benefits as

the March 2015 Agreement gave Acheron Capital the right to actively participate in the negotiation of any new servicing agreements and the right to refuse to approve any new servicing agreements that were not on commercially reasonable terms or otherwise violated portions of the March 2015 Agreement. *See Enforcement Action* at DE 2500-2 at ¶3. The March 2015 Agreement also provided for the Trustee and Acheron Capital to submit disputes over the approval of new servicing agreements to mediation and arbitration. *Id.* Disagreements between the Trustee and Acheron Capital have nonetheless continued, which prompted the Acheron Entities' filing of a separate lawsuit against the Trustee. *See Acheron Portfolio Trust, et al., v. Barry Mukamal, as Trustee of the Mutual Benefits Keep Policy Trust*, Case No. 18-25099-CIV-MORENO initiated December 5, 2018 (the "Acheron Litigation").

On October 16, 2020, the Trustee filed notice that he had selected Q Capital Strategies, LLC ("Q Capital") as primary servicer upon expiration of the Servicing Agreement. *See Enforcement Action* at DE 2795. Acheron Capital has refused to approve the new servicing agreement with Q Capital, triggering an ongoing arbitration between the Trustee and Acheron Capital. *See* DE 18 at 10; 18 (referring to Q Capital as "an unqualified and untested servicer" lacking in experience with respect to servicing fractional interests and stating that the pending

---

interests owned by original fraud victims, which dispute is referenced in the preamble of the agreement:

> WHEREAS, as a purchaser of fractional interests in Keep Policies, Acheron asserts that it has acquired all right, title and interest of the Keep Policy Investors in such policies, and therefore, stands in the shoes of the Keep Policy Investors with respect to such fractional interests, and therefore, is entitled to all of the same rights and benefits as the Keep Policy Investors under the Trust, the Servicing Agreement, the Renewal Agreement, and any further extension of the Servicing Agreement or new servicing agreement, an assertion with which the Trustee does not necessarily agree and as to which the Trustee reserves all rights including the right to contest these assertions, subject to the terms and conditions set forth in this Agreement.

arbitration will "address, among other issues, the commercial reasonableness of having Q Capital serve as primary servicer").  The Trustee, Litai, and Acheron Capital, in its capacity as the investment manager for Acheron Portfolio Trust, Avernus Portfolio Trust, Lorenzo Tonti 2006 Trust and STYX Portfolio Trust, agreed upon an extension of the Servicing Agreement to allow time for the Trustee and Acheron Capital to arbitrate disputes related to a new servicing agreement with Q Capital.  *See Enforcement Action* at DE 2797 at 6:20-10:16; DE 2794; DE 2794-1; DE 2798.

The instant dispute relates to the Trustee's decision to broaden his choice of servicers for the Trust Assets.  The Trustee has recognized that very few servicers of life insurance policies provide servicing for fractional interests like those owned by investors in the Keep Policies.  *See Enforcement Action* at DE 2797 at 24:14-25:8; 26:1-33:22.  Therefore, the Trustee chose to contract with  Proactive Technologies, LLC ("ProTech") to develop software for management of the fractional interests.  Given the Trustee's selection of Q Capital to replace Litai as the Trust's primary servicer, the Trustee planned for Q Capital to utilize the software developed by ProTech to supplement Q Capital's systems.  *See* DE 1 at ¶¶49-53; DE 1-5; DE 13-1 at ¶¶10-13; *see also Enforcement Action* at DE 2797 at 24:14-25:8; 26:1-33:22.  Acheron Capital's Petition to Compel Arbitration alleges that the agreement with ProTech ("ProTech Agreement") is itself a new servicing agreement as contemplated by the March 2015 Agreement and that the Trustee refused to participate in the arbitration process with respect to the ProTech Agreement as required under the terms of the March 2015 Agreement.  (DE 1 at ¶¶57, 62).  The Trustee moves to dismiss Acheron Capital's Petition to Compel on the basis that the Trust Plaintiffs lack standing to enforce the March 2015 Agreement, that no agreement to arbitrate the ProTech Agreement exists, and that, even if an agreement to arbitrate does exist, the ProTech Agreement is beyond the scope of what

the parties agreed to arbitrate because it is not a new servicing agreement.  (DE 13 at 10-19; DE 26 at 8).  Acheron Capital argues that the issues raised in the Motion to Dismiss are for an arbitrator, rather than the Court, to decide but addresses the merits of the Motion to Dismiss in the alternative in case the Court does not agree.  (DE 18 at 13).

## LEGAL STANDARD

An arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  The Federal Arbitration Act ("FAA") "creates a 'presumption of arbitrability' such that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'"  *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1115-16 (11th Cir. 2014)).  Despite the federal policy favoring arbitration, however, the default rule is that the courts, not the arbitrator, decide "certain gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy."  *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003) (citations omitted).  Thus, "[t]he question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the question of arbitrability, is an issue for judicial determination unless the parties clearly and unmistakably provide otherwise."  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, (2002).  Parties are free to draft their arbitration agreements to circumvent the default rules and "may [also] limit by contract the issues which they will arbitrate."  *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989).  "[W]hen parties incorporate the rules of [an Arbitration] Association into their contract, they 'clearly and unmistakable agree[ ] that the arbitrator should decide whether the arbitration clause [applies].'"  *U.S. Nutraceuticals, LLC v. Cyanotech Corp.*, 769 F.3d 1308, 1311

(11th Cir. 2014) (quoting *Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1332 (11th Cir. 2005)).

When a motion to compel arbitration is filed, courts consider the following: "(1) whether a valid agreement to arbitrate exists, (2) whether an arbitrable issue exists; and (3) whether the right to arbitrate was waived." *Gomez v. Allied Professionals Ins. Co.*, No. 19-CV-24994, 2020 WL 2197865, at *3 (S.D. Fla. May 6, 2020) (citations omitted). *See also Seifert v. U.S. Home Corp.*, 750 So. 2d 633, 636 (Fla. 1999) ("Under both federal statutory provisions and Florida's arbitration code, there are three elements for courts to consider in ruling on a motion to compel arbitration of a given dispute: (1) whether a valid written agreement to arbitrate exists; (2) whether an arbitrable issue exists; and (3) whether the right to arbitration was waived." (citation omitted)). "When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc., v. Kaplan*, 514 U.S. 938, 944 (1995).

Furthermore, courts apply a summary-judgment-like standard to determine whether an agreement to arbitrate exists. *Bazemore*, 827 F.3d at 1333 (citing Fed. R. Civ. P. 56(a)). Accordingly, where "there is no genuine dispute as to any material fact concerning the formation of [an arbitration] agreement," a court may decide "as a matter of law that [the] parties did or did not enter into an arbitration agreement." *Id.*

## ANALYSIS

Here, I find that that the issue of arbitrability is for the Court, not an arbitrator, to decide. Additionally, I find that the Trust Plaintiffs cannot enforce the March 2015 Agreement by virtue of Acheron Capital's agency or by virtue of the Trust Plaintiffs' status as third-party beneficiaries of the March 2015 Agreement. Furthermore, notwithstanding Acheron Capital's contentions to

the contrary, I conclude that the ProTech Agreement is not a servicing agreement.  Therefore, it is not subject to the March 2015 Agreement's arbitration clause.

I.      **Whether Gateway Issues Have Been Delegated**

Acheron Capital's argument that gateway issues have been delegated fails for the following reasons.  Acheron Capital argues that the parties invoked JAMS rules by agreeing to submit disputes about servicing agreements to JAMS.   (DE 18 at 13-14) (referencing the March 2015 Agreement at DE 1-4 at ¶3(c)).  The March 2015 Agreement references to JAMS are as follows:

> c.      Acheron may refuse to approve any new servicing agreement or further extension of the Renewal Agreement which is not on commercially reasonable terms . . ..  If Trustee and Acheron are unable to agree *with respect to the terms of a new servicing agreement* . . ., then the parties shall submit their dispute to mediation by a mediator who is mutually acceptable to both parties.  If the parties are unable to agree on a mediator, the dispute shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then . . . it *shall be submitted to JAMS*, or its successor, for final and binding arbitration pursuant to the provisions set forth below. . . .
>
> > (iii)     Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the declaration of an impasse by the mediator . . ..  At no time prior thereto shall either side initiate an arbitration or litigation related to this Agreement except to pursue a provisional remedy that is authorized by law or by JAMS Rules or by agreement of the parties.  However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements set for the in Section (i) [as to selecting a mediator] above.

(DE 1-4 at ¶3(c)(iii)) (emphasis added).

As the Trustee correctly argues, the March 2015 Agreement does not incorporate JAMS rules.  (DE 13 at 18).  The agreement does not even state what rules will apply.  *Id.*  Although Acheron Capital argues that JAMS's default rules claim authority for the arbitrator to decide questions of arbitrability, the March 2015 Agreement itself does not contain the kind of "clear and unmistakable" incorporation of those rules that would reflect agreement to those rules and the consequent delegation of authority to decide arbitrability.  *Cf. U.S. Nutraceuticals*, 769 F.3d at

8

1309-1311 (analyzing agreements requiring arbitration "under the auspices and rules of the American Arbitration Association") (emphasis added).

Furthermore, I do not find that the March 2015 Agreement, or the arbitration clause within it, contains a delegation clause delegating the gateway issue of arbitrability. Courts have found broad language subjecting disputes to arbitration to clearly and unmistakably delegate gateway issues to an arbitrator rather than the court. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (reviewing delegation clauses that provide for "arbitration of all past, present, or future disputes arising out of [an agreement]," or state that "the arbitrator shall have exclusive authority to resolve any dispute relating to the enforceability of [the agreement]"). Here, the March 2015 Agreement lacks such broad language. The March 2015 Agreement subjects specific disputes to arbitration while the broad language in ¶23 provides for the jurisdiction of this Court relative to "any [other] legal action, suit or proceeding . . . arising out of or in connection with this Agreement."[6] (DE 1-4 at ¶23). Thus, I conclude that March 2015 Agreement lacks a delegation clause indicating intent to delegate gateway issues to arbitration that presumptively are for the Court under the FAA.

Moreover, Acheron Capital cites no authority for its position that the language in the arbitration clause of the March 2015 Agreement requiring the parties to submit disputes about new servicing agreements to JAMS reflects the parties' intent to have gateway issues decided by an arbitrator. Nor do I otherwise find authority supporting Acheron Capital's position. Therefore, I do not credit Acheron Capital's argument and find that the parties did not express clear and unmistakable intent to delegate issues of arbitrability to an arbitrator. *See First Options of*

---

[6] Although not applicable here, ¶23 also provides for actions not subject to the arbitration clause to be brought "in the courts of the State of Florida, sitting in Miami-Dade County" where this Court lacks subject matter jurisdiction. (DE 1-4 at ¶23).

*Chicago, Inc.*, 514 U.S. at 944 (holding that silence or ambiguity as to who will decide issues of arbitrability means that the issues are presumably for judicial determination).  Accordingly, because I find that this Court must decide the gateway issues of arbitrability pertaining to the instant dispute, I proceed by addressing the merits of the parties' dispute.

## II.   <u>Whether the Trust Plaintiffs can Enforce the March 2015 Agreement</u>

Although not dispositive to the Trustee's Motion to Dismiss, I find that the Trust Plaintiffs cannot enforce the March 2015 Agreement for the reasons set forth herein.[7]  Specifically, I find that Acheron Capital's two arguments – (1) that it executed the March 2015 Agreement as agent for the Trust Plaintiffs, and (2) that the Trust Plaintiffs are third-party beneficiaries of the agreement – lack merit.  As the Supreme Court has emphasized, the FAA only authorizes a court to compel arbitration to give effect to the intent *of the parties* to the agreement to arbitrate.  *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683–84 (2010) (collecting cases); *see also Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989) ("We give effect to the contractual rights and expectations of *the parties*.") (emphasis added).  Thus, "'[n]on-parties to a contract containing an arbitration clause cannot compel parties to a contract to arbitrate unless it is determined that they are a third-party beneficiary to the contract.'"  *Peters v. The Keyes Co.*, 402 F. App'x 448, 451 (11th Cir. 2010) (quoting *Fla. Power & Light Co. v. Road Rock, Inc.*, 920 So.2d 201, 203 (Fla. 4th DCA 2006)).

---

[7] I note that this issue is part of the Trustee's pending motion for summary judgment in the Acheron Litigation, wherein he alleges that the Trust Plaintiffs "are not parties to the March 2015 Agreement" and thus "lack the privity of contract necessary to assert the contract-based claims [in the complaint in that action]."  *See* Case No. 18-25099-CIV-MORENO, DE 77 at 4.  If the Court agrees with my recommendation below, that the Petition should be dismissed because the ProTech Agreement is not a servicing agreement, the Court may choose not to reach the issue of whether the Trust Plaintiffs may enforce the 2015 Agreement.

## A.  **Acheron Capital's Agency Status**

Acheron Capital argues that its role as investment manager to the Trust Plaintiffs whose interests are at stake, which role the Trustee acknowledges in his declaration, establishes its agency status. (DE 18 at 15-16).  The Trustee counters that Acheron Capital's publicly disclosed role as investment manager is insufficient to confer agency status upon it and merely signifies Acheron Capital's status as a vendor to its clients.  (DE 13 at 12). The Trustee also argues that Acheron Capital never provided documentation evidencing that the Trust Plaintiffs conferred agency status upon Acheron Capital at the time that Acheron Capital executed the March 2015 Agreement.  *Id.* at 11-13.  Specifically, the Trustee argues and declares that the Trust Plaintiffs never provided a power of attorney or consent that conferred the status of agent upon Acheron Capital with respect to the March 2015 Agreement.  (DE 13 at 13; DE 26 at 5; DE 13-1 at ¶8).  As the Trustee correctly argues, "where there has been no representation of authority *by the principal*, no apparent or implied agency arises."  (DE 26 at 4-5) (citing *Stalley v. Transitional Hosps. Corp. of Tampa, Inc.*, 44 So. 3d 627, 630 (Fla. 2d DCA 2010)). (emphasis added).

The Trustee additionally argues that, even if Acheron Capital is an agent for the Trust Plaintiffs, it signed only on its own behalf and not as an agent on behalf of its principal.[8]  (DE 13 at 12; DE 1-4 at 8).  The Trustee argues that Acheron Capital demonstrated that it knew how to sign in a representative capacity because it did so in each Asset Purchase Agreement ("APA")[9] but did not do so with respect to the March 2015 Agreement.  (DE 26 at 5).  *See* DE 1-3 at 16 (reflecting that Carlo Toller signed an APA dated August 4, 2017 as "Investment Manager on

---

[8] For reasons discussed *infra*, I reject Acheron Capital's contention, based on a recital in the March 2015 Agreement that defined "Acheron" as Acheron Capital and its clients, that it signed the agreement in a representative capacity for its clients.  (DE 18 at 17).

[9] Asset Purchase Agreements document and govern the purchase of fractional interests in the life insurance policies held by the Mutual Benefits Trust.  (DE 1 at ¶18, 31, 33-35; DE 1-3).

Behalf of Avernus Portfolio Trust"); *but see* DE 1-4 (reflecting that Carlo Toller signed the March 2015 Agreement as "Director of Acheron Capital, Ltd.").  Therefore, the Trustee contends that Acheron Capital is the only party to the March 2015 Agreement as signified by its own conduct. (DE 13 at 13).  I agree.  Accordingly, for all of the above reasons, Acheron Capital's argument that its role as investment manager for the Trust Plaintiffs confers upon it agency status with respect to the March 2015 Agreement fails.

### B.    <u>Trust Plaintiffs' Third-Party Beneficiary Status</u>

The Trustee argues that Acheron Capital has not established that the Trust Plaintiffs are third-party beneficiaries of the March 2015 Agreement.  Specifically, the Trustee argues that the agreement does not expressly provide for it to benefit the Trust Plaintiffs and that the Trustee did not intend for the agreement to benefit the Trust Plaintiffs.  (DE 13 at 13). "A party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994); *see also Steadfast Ins. Co. v. Corp. Prot. Sec. Group, Inc.*, 554 F. Supp. 2d 1335, 1338 (S.D. Fla 2008) (holding that, under Florida law, parties to a contract must manifest clear intent to benefit a third-party where "the contract does not expressly provide for the third party beneficiary" and citing *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1003 (11th Cir. 2004) (finding "no clear evidence that both parties intended to benefit [the third-party]")).

The Trustee argues that the March 2015 Agreement was not intended to benefit the Trust Plaintiffs for the following reasons.  First, the agreement does not expressly provide that it benefits the Trust Plaintiffs.  Second, the Trustee declares that Acheron Capital never requested that the Trust Plaintiffs be included as signatories and never requested that the March 2015 Agreement

reflect that Acheron Capital was signing on behalf of any other entities.  (DE 13-1 at ¶6).  Third, the Trustee declares that, because the Trust Plaintiffs had already purchased interests in assets held by the Trust, there would have been no benefit to the Trust from entering into the March 2015 Agreement with the Trust Plaintiffs.  *Id.* at ¶7.  Rather, the Trustee attests that he was interested in negotiating with Acheron Capital because he understood Acheron Capital to be an investment advisor that would recommend purchases of <u>future</u> defaulting policy interests.  *Id.* (emphasis added).  Thus, according to the Trustee, he did not intend the March 2015 Agreement to benefit the Trust Plaintiffs.

Acheron Capital, on the other hand, argues that the March 2015 Agreement *expressly* provides that the agreement was entered into for the benefit of the Trust Plaintiffs because of language in the agreement's preamble:

> WHEREAS, Acheron Capital Ltd. *or clients advised by Acheron (collectively "Acheron")* have purchased interests in Keep Policies as a result of Disposition Services conducted by Litai; and . . .
>
> WHEREAS, Acheron wishes to continue to acquire *or have its current or future clients acquire* interests in Keep Policies as may be sold by the Trust, and the Trustee wishes for Acheron to remain an interested purchaser in such interests.

(DE 18 at 16; DE 1-4 at 1) (emphasis added).  (DE 18 at 16).  Acheron Capital argues that the March 2015 Agreement evidences the intent to benefit these parties by referring throughout the Agreement to "Acheron," which is defined in the preamble to mean Acheron Capital and its clients. (DE 1-4).  Acheron Capital also posits that the March 2015 Agreement's reference to Acheron Capital and its clients, collectively is evident in the agreement's signature block:

> **IN WITNESS WHEREOF**, the Trustee and *Acheron* have caused their names to be signed hereto by the undersigned authorized persons as of the day and year first above written.

(DE 18 at 17; DE 1-4 at 8) (emphasis added).

13

The Trustee counters that the operative provision that begins the March 2015 Agreement defines "Acheron" as only Acheron Capital, Ltd.:

> This Agreement, dated as of March 19, 2015, is entered into by and among Barry Mukamal, as Trustee ("Trustee") of the Mutual Benefits Keep Policy Trust (the "Trust"), and Acheron Capital, Ltd. ("Acheron").

(DE 26 at 6; DE 1-4 at 1).  Furthermore, the Trustee argues that paragraph 15 of the March 2015 Agreement expressly states that the agreement "provides no rights or interests in any person or entity not a party to this Agreement," which would include the Trust Plaintiffs.  (DE 26 at 4; DE 1-4 at ¶15).

I find that the March 2015 Agreement does not clearly express an intent to benefit the Trust Plaintiffs.  Acheron Capital's argument that the March 2015 Agreement evinced such an intent by subsuming Acheron Capital's clients with the defined term "Acheron" is unavailing because that term is defined differently in two different clauses.  Where there is a discrepancy between a recital and an operative clause of a contract, the operative clause prevails.  *Johnson v. Johnson*, 725 So. 2d 1209, 1212-13 (Fla. 3d DCA 1999) (citing *Northern Trust Co. v. King*, 6 So. 2d 539, 540 (Fla. 1942) and stating that, "[u]nder Florida law, an operative clause of an agreement prevails over the recital clause when there is a discrepancy between the two").  Here, the March 2015 Agreement's operative provision defines "Acheron" only as Acheron Capital, Ltd.  Therefore, I conclude that the operative provisions of the March 2015 Agreement refer solely to Acheron Capital and not to its clients, including the language preceding the signature block.  Accordingly, Acheron Capital's argument that the March 2015 Agreement expresses "an intent to primarily and directly benefit" the Trust Plaintiffs on the basis of language in the recitals fails.

Furthermore, I find that the parties did not otherwise intend the March 2015 Agreement to benefit the Trust Plaintiffs.  The agreement specifically provides for no rights to inure to non-

parties.  Additionally, the Trustee swears that Acheron Capital never requested, and that he never intended, for the Trust Plaintiffs to be parties to, or beneficiaries of, the March 2015 Agreement. In any event, Acheron Capital only argues that the language of the March 2015 Agreement itself demonstrates that the agreement was intended to benefit the Trust Plaintiffs, which I find it does not.   Thus, Acheron Capital's argument that the Trust Plaintiffs are intended third-party beneficiaries of the agreement fails.  Accordingly, I find that the only parties to the March 2015 Agreement are the Trustee and Acheron Capital and that the Trust Plaintiffs lack ability to compel arbitration under that agreement as third-party beneficiaries.  Nonetheless, Acheron Capital has standing to enforce the March 2015 Agreement; thus, the Trust Plaintiffs' lack of standing to enforce the agreement is not determinative as it pertains to the Trustee's Motion to Dismiss.

### III.   <u>Whether the ProTech Agreement is a Servicing Agreement</u>

For reasons stated herein, I find that the ProTech Agreement is not a servicing agreement. Therefore, I conclude that the Trustee is correct that, due to a lack of mutual assent, an agreement to arbitrate the ProTech Agreement does not exist.  (DE 13 at 10; 14-16).  Additionally, I agree with the Trustee that, because the ProTech Agreement is not a servicing agreement, the instant dispute is outside of the narrow scope of issues contemplated by the subject arbitration clause.  *Id.* at 10-11; 14-16.

The March 2015 Agreement does not contain an explicit definition of "servicing agreement."  In order to define what constitutes a "servicing agreement," the Trustee points to what has served as the framework for a servicing agreement since inception of the Trust – the Trust's agreements with Litai.  (DE 13 at 14-15).  The Trustee argues that the ProTech Agreement is not a servicing agreement because it lacks the characteristics a servicing agreement under these criteria.   The Trustee compares the obligations and duties of ProTech under the ProTech

Agreement to the obligations and duties of Litai under the Trust's existing Servicing Agreement and contends that there is *no overlap* between the two:

| PROTECH AGREEMENT | SERVICING AGREEMENT WITH LITAI |
|---|---|
| **Software** platform design for fractional policy billing and tracking | *None.* |
| **Platform** hosting | *None.* |
| **Software** platform maintenance | *None.* |
| *None.* | Premium/Funds Management. |
| *None.* | Policy Premium Payment Services. |
| *None.* | Accounting and Reporting Services. |
| *None.* | Insured Tracking Services. |
| *None.* | Claim Processing. |
| *None.* | Maturity Tracking. |
| *None.* | Policy Change Services for Keep Policy Investors. |
| *None.* | Financial Reporting. |
| *None.* | Disposition Services. |

("Trustee's Comparison") (DE 13 at 15).  The Trustee's use of the Servicing Agreement with Litai as the reference point for what constitutes a "servicing agreement" is logical and consistent with both the plain language of the March 2015 Agreement and the history of the *Enforcement Action*. The Trustee's analysis showing that the obligations of the ProTech Agreement has no overlap with the obligations of the Servicing Agreement with Litai is, therefore, compelling.

Acheron Capital does not effectively counter the Trustee's argument that the ProTech Agreement imposes none of the responsibilities upon ProTech that the existing Servicing Agreement imposes with respect to Litai.  Rather, Acheron Capital makes two main arguments as to why the ProTech Agreement is a servicing agreement.  First, it contends that the fact that ProTech software is essential to Q Capital's ability to perform as primary servicer makes the

ProTech Agreement a servicing agreement.  Second, Acheron Capital asserts that expert testimony can define what constitutes "servicing" and that a detailed analysis of Litai's day-to-day activities, compared to the anticipated day-to-day activities it expects ProTech and Q Capital, respectively, to perform will allow the Court to conclude that the ProTech Agreement is a servicing agreement. I find Acheron Capital's arguments to lack merit for the reasons stated below.

As to the first argument, Acheron Capital argues that, because Q Capital cannot service the fractional interests held by the Trust without supplementing its services with the ProTech software, the ProTech Agreement is a servicing agreement.[10]  (DE 18 at 18-20; DE 31 at 24:19-20).  Acheron Capital supports the contention that the ProTech Agreement is an essential component of Q Capital's ability to service the Trust's fractional interests with the declaration of industry veteran, Mr. Bryan Cooper.[11]  (DE 18 at 18-20; DE 18-2).

---

[10] Acheron Capital additionally contends that the ProTech Agreement "should have been part of Q Capital's proposal to serve as primary servicer," which it asserts will be addressed in the pending arbitration proceeding with the Trustee with respect to a new servicing agreement between the Trustee and Q Capital.  *Id.* at 18.

[11] Cooper is the co-owner of an alternative asset management firm, with over fifteen (15) years of investing and insurance-related experience; his Declaration is attached to Acheron Capital's Response.  (DE 18-2 at ¶¶2-3).  Mr. Cooper declares, among other things, that "normal" servicing in the life settlement industry commonly refers to the administration of life settlement policies on behalf of policy owners.  *Id.* at ¶10.  Mr. Cooper also opines that such servicing has two primary components: policy servicing (verifying of premium amounts to be paid to keep policies in force) and tracking (keeping track of the maturity of policies through mail or phone check ins with insureds or through other investigative measures).  *Id.*  Mr. Cooper differentiates fractional servicing as "a far more labor-intensive activity [requiring] both a sophisticated fractional investor servicing team and system."  *Id.* at ¶11.  Mr. Cooper estimated the requirements for servicing the Trust's fractional interests as "at least ten well-versed and experienced client care team members and an integrated system with client portals that provides, among other services[,] automatic premium call notices to fractional investors with live follow ups, auto debit payment system with verifications and client receipts, and fractional investor tracking."  *Id.* at ¶13.  Additionally, Mr. Cooper opined that, while he did not know whether ProTech's software could meet the needs of Q Capital with respect to servicing fractional interests, "it [was] very clear to [him] that Pro Tech's

Acheron Capital's basis for arguing that the Protech software, and thus the ProTech Agreement, would provide an essential piece of the servicing with respect to an agreement with Q Capital relates to ProTech's integration with Q Capital.  At the Status Conference, Acheron Capital essentially argued that the Trustee's separate and independent payment for the ProTech software justified it being considered a servicing agreement because the software was a "servicing component" or "a servicing tool for fractional interests" that Q Capital would no longer have available if the Trust stopped paying for it.  (DE 31 at 48:3-10; 49:17-20).  Although Acheron Capital has acknowledged that the Trustee has negotiated a lower cost with Q Capital on the basis of Q Capital's use of the ProTech software, Acheron Capital has argued that, because the cost of the ProTech Agreement is incorporated into the agreement with Q Capital, "it is a servicing agreement" and "the arbitrator [in the arbitration over the proposed Q Capital agreement] cannot decide one without the other." *Id.* at 26:5-28:14.  Additionally, Acheron Capital has pointed to the ProTech software's communication with Q Capital's system as justification for considering the ProTech Agreement a servicing agreement based upon the Trustee's testimony that "the policy servicing system will interact with the software" and "everything [will be] working in tandem with each other."  *Id.* at 51:21-25.

Furthermore, because of this "interaction," Acheron Capital has argued that the Court's decision about the ProTech Agreement needs to be informed by a detailed comparative analysis of the various agreements at issue.  Specifically, Acheron Capital proposed that the Court should determine whether the ProTech Agreement was a servicing agreement by doing a "side-by-side comparison of Litai versus Protech, versus [Q] Capital, to see who is doing what, and what is

---

software . . . is a critical component of the servicing that Q Capital has been asked to take over." *Id.* at ¶15.

servicing what portion of the portfolio." *Id.* at 52: 17-19.  For reasons discussed below, I do not find that the essential nature of ProTech's software transforms the ProTech Agreement into a servicing agreement nor do Acheron Capital's examples of interaction and integration between ProTech and Q Capital demand a different conclusion.

As discussed at the Status Conference, ProTech's software being an essential component to Q Capital's ability to service fractional interests does not, *a fortiori*, make the ProTech Agreement a servicing agreement.  Rather, it is Q Capital's "responsibility" for performance of servicing obligations that matters, not what "tool" or "component" facilitates Q Capital's ability to perform, despite how the tool interacts or integrates.  Once Q Capital, or any vendor, contracts to provide servicing, they are responsible regardless of what tools they use or have available to them.  If one tool becomes insufficient or unavailable, then the vendor obligated to provide the servicing is responsible to acquire a suitable replacement tool or to develop its own capabilities.  Furthermore, as the Trustee correctly argued at the Status Conference, "the vendor that developed PBTS [(Litai's software system that it uses for servicing)], wasn't a servicer . . . [a]nd  the agreement to develop that . . . wasn't a servic[ing] agreement." *Id.* at 59:4-8.

Also, Acheron Capital's argument regarding centrality insufficiently limits the boundaries of what could be considered "servicing."  As the Trustee argues in his Reply, employment contracts, office leases, and any number of contracts for services or tangible goods could be subject to arbitration as "servicing agreements" using the logic that those contracts provide necessary products or services for a primary servicer to carry out its servicing responsibilities.[12]  (DE 26 at

---

[12] Q Capital's need for the ProTech software in order to function as a servicer of fractional interests may very well be of significance in the arbitration between Acheron Capital and the Trustee over the Trustee's proposed agreement with Q Capital for primary servicing.  If so, Acheron Capital has a readily available forum to litigate those issues – the already pending arbitration over the Q

8).  Therefore, I find that Acheron Capital's argument – that the ProTech Agreement is a servicing agreement based upon its centrality to Q Capital's ability to provide servicing – is unavailing.

Regarding Acheron Capital's second argument, it did not agree with the Trustee's comparative approach to defining a servicing agreement because "you can't put every single solitary thing that Litai does for the Trust into a servicing agreement."  (DE 31 at 53:12-54:3).  Rather than look to the responsibilities established by the Litai's contract to define what the parties would have understood in 2015 to constitute "servicing" and comparing them to the responsibilities of ProTech, Acheron Capital would have the Court hear expert testimony on what constitutes servicing and embark on a detailed analysis of each entities' daily tasks.  Acheron Capital contended that the daily tasks, rather than the broad categories laid out in Litai's contract for servicing the Trust portfolio, are important to understand for purposes of determining whether the ProTech Agreement is a servicing agreement.  *Id.* at 54:7-55:5.

Acheron Capital provides no explanation, however, as to why or how the plain language of the parties' agreements, which are summarized in the Trustee's Comparison, are insufficient such that either expert testimony or a detailed examination of Litai's daily activities is necessary.  Although the Q Capital agreement has not yet been submitted for Court approval, the reasonable inference is that the agreement with Q Capital will cover the responsibilities that are presently imposed upon Litai.  By arguing in a conclusory manner that resolving the instant dispute requires examining Litai's daily activities, Acheron Capital seems to concede that Litai's responsibilities under the primary servicing agreement are pertinent to analyze in the instant dispute.  Acheron

---

Capital agreement itself – without a need to separately compel arbitration over the ProTech agreement.  But the centrality of ProTech's software to evaluating Q Capital's capability to perform as the primary servicer does not transform the ProTech Agreement into a servicing agreement itself subject to a separate arbitration.

Capital fails to address, however, why the Trustee's Comparison – setting forth the servicing obligations that Q Capital is expected to assume and demonstrating that ProTech's responsibilities are separate and apart from the responsibilities of a servicer – is an incorrect framework for analyzing whether the ProTech Agreement is a servicing agreement.  Nor does Acheron Capital dispute that the responsibilities, as they are outlined in the Trustee's Comparison, are correct.  I find Acheron Capital's second argument, therefore, to be unavailing and conclude that a detailed examination of Litai's daily activities and expert testimony should not be, and is not, necessary to determine what is a "servicing agreement" for purposes of the March 2015 Agreement..

Acheron Capital also argues that, given "the servicing nature" of the ProTech Agreement, it should have the right to arbitrate the "the ProTech dispute" separate from the dispute's effect on Q Capital as well as in the context of the dispute's effect on Q Capital.  *Id.* at 20.  In this context, Acheron Capital argues that, as affirmed by the Eleventh Circuit, the March 2015 Agreement's provisions as to Acheron Capital's rights with respect to servicing agreements applies to all servicing agreements and "does not limit these rights to the provision of primary servicing agreements."  *Id.* at 18 (quoting *Sec. & Exch. Comm'n v. Mut. Benefits Corp.*, 810 F. App'x 770, 775 (11th Cir. 2020).

Acheron Capital's reliance on the Eleventh Circuit's holding regarding servicing agreements, however, is misplaced.  As the language quoted by Acheron Capital indicates, the Eleventh Circuit instructed that "servicing agreements" of all kinds were subject to Acheron Capital's rights as set forth in the March 2015 Agreement.  The Trustee's argument, however, does not rely on the premise that the ProTech Agreement is a secondary or supplementary servicing agreement, as opposed to a "primary" servicing agreement.  Rather, the Trustee argues that it is not a servicing agreement at all.  The Eleventh Circuit did not expand Acheron Capital's rights to

agreements beyond servicing agreements. Here, the Eleventh Circuit's holding that Acheron Capital references has no application because I conclude for the reasons stated herein that the ProTech Agreement is an agreement for software and is not a servicing agreement.

In sum, I find that the ProTech Agreement is not a servicing agreement for several reasons. First, as the Trustee correctly identifies, and as Acheron Capital does not dispute, the ProTech Agreement addresses none of the categories of duties and obligations that characterize servicing under the existing Servicing Agreement. Second, the parties acknowledge that Q Capital, as the proposed replacement servicer for Litai, will use the software provided under the ProTech Agreement to perform the duties and obligations of servicing. In other words, the parties recognize that ProTech is not directly providing any servicing. Rather, Q Capital will be responsible for providing the Trust's servicing. Third, Acheron Capital's contention that the ProTech Agreement is a servicing agreement because a primary servicer needs to use the ProTech software to perform its servicing obligations is unavailing and produces absurd results. Fourth, reliance upon the plain language of the agreements currently in place and the Trustee's Comparison is adequate for the Court to determine that the ProTech Agreement is not a servicing agreement, and Acheron Capital fails to demonstrate that expert testimony or a more detailed examination of Litai's activities is necessary or that reliance upon the agreements' terms and the Trustee's Comparison is otherwise insufficient.

Thus, having concluded that the ProTech Agreement is not a servicing agreement, I next address the Trustee's arguments that the Petition to Compel Arbitration should be dismissed because no agreement to arbitrate was formed and no arbitrable issue exists. As stated previously, the Trustee first argues that no agreement to arbitrate the ProTech Agreement exists. (DE 13 at 16). Secondly, the Trustee argues that the parties' dispute about the ProTech Agreement is outside

the scope of any agreement to arbitrate, which issue regarding scope is presumably for the Court to decide.  (DE 13 at 16-19; DE 26 at 3-4, 8).

The Trustee is correct that the plain language of the March 2015 Agreement does not extend to disputes beyond those "servicing agreement."  (DE 13 at 16).   Under Florida law, "mutual assent is a prerequisite for the formation of any contract."  *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014) (citations omitted).   "Mutual assent is not necessarily an independent 'element' unto itself; rather, we evaluate the existence of assent by analyzing the parties' agreement process in terms of offer and acceptance."  *Id.*   Here, there is no indication of an offer, and acceptance of such offer, to arbitrate disputes other than those relating to servicing agreements.   In fact, the Trustee avers that no mutual assent exists to arbitrate disputes beyond what is provided for by the terms of the March 2015 Agreement.  (DE 13 at 16).   Because there is no evidence of mutual assent here to arbitrate disputes pertaining to anything other than servicing agreements, and because I conclude that the ProTech Agreement is not a servicing agreement, I find that no agreement to arbitrate the ProTech Agreement exists.   Accordingly, for this reason, the Trustee's Motion to Dismiss should be granted.

"[C]ourts may not require arbitration beyond the scope of the contractual agreement, because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *JPay, Inc.*, 904 F.3d at 929 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)).   Here, the March 2015 Agreement includes a narrow arbitration provision requiring arbitration with respect to disputes pertaining to the terms of servicing agreements.  (DE 1-4 at ¶3(c)(iii)).   Because I conclude that the instant dispute does not pertain to a servicing agreement, I find that the Court should not compel the parties to arbitrate it. Therefore, the Trustee's Motion to Dismiss should be granted on this basis as well.

## CONCLUSION

For the reasons discussed above, I respectfully **RECOMMEND** that:

1. The Motion to Dismiss (DE 13) be **GRANTED**;

2. The Petition to Compel Arbitration (DE 1) be **DISMISSED**;

3. The Clerk of the Court be directed to mark the case **CLOSED**.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Darrin P. Gayles, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida on this 6th day of April 2021.

Jared M. Strauss
United States Magistrate Judge

Copies furnished via CM/ECF to:

Hon. Darrin P. Gayles
Counsel of record

24